PETTIGREW, J.
 

 | ¡.This appeal arises out of the trial court’s maintenance of defendants’ dilatory exception raising the objection of prematurity. Following a thorough review of the record, we reverse and remand.
 

 FACTS
 

 On or about March 1, 1992, petitioner, Jack Patrick Harris (“Mr. Harris”), purchased a Professional Disability Policy issued by New England Mutual Life Insurance Company, now Metropolitan Life Insurance Company (“MLIC”), a subsidiary of Met-Life, Inc., an insurance holding company.
 
 [1]
 
 Mr. Harris, an attorney engaged in the practice of law in Louisiana since 1977, ceased practice upon the advice of his treating psychiatrist on September 15, 2005, due to mental health conditions that Mr. Harris claims became physically manifest in 2000.
 

 Due to his alleged inability to engage in the active practice of law, Mr. Harris filed a claim for benefits with MLIC, his professional disability insurer on November 21, 2005. Said claim consisted of a Notice of Claim and a general all purpose medical authorization both executed by Mr. Harris.
 

 On or about December 9, 2005, Mr. Harris received a package addressed to him from New England Financial, A Met-Life Affiliate (“NEF”) containing claimant instructions, and various forms, (1) an “Attending Physician’s Statement”; (2) a “Claimant Statement”; (3) an “Employment Statement”; (4) a “Job Description”; and (5) an “Employee Authorization.” Mr. Harris thereafter forwarded to Dr. Dennis Raymond, his treating physician, the “Attending Physician’s Statement” and completed and returned via facsimile transmission and certified mail on December 26, 2005, the remaining forms sent to him by NEF with the exception of the “Employee Authorization.” Mr. Harris explained his objections to execution of the “Employee’s Authorization” in his accompanying transmittal Lletter. On January 11, 2006, Mr. Harris supplemented his response with a statement detailing his net income for the period January 2005 through September 15, 2005, together with copies of bank records corroborating said fees. Mr. Harris also advised NEF of his decision to petition the Louisiana Supreme Court for a medical leave of absence from the practice of law.
 
 [2]
 

 On January 12, 2006, Ms. Katherine Sa-galoglou, Intake Specialist, with the Disability Benefits Center of NEF wrote to Mr. Harris acknowledging receipt of the requisite Claimant’s and Attending Physician’s Statements and advising NEF would be unable to begin evaluation of Mr. Harris’ claim without receipt of the signed “Employee’s Authorization.”
 

 
 *269
 
 Mr. Harris received correspondence dated January 20, 2006, from a Kathryn J. Roberts, Manager, with the Worcester Benefit Operations of NEF. Ms. Roberts responded to Mr. Harris’ refusal to execute the “Employee Authorization” sent to him by NEF with the explanation that “the purpose of the authorization [was] to allow [NEF] to obtain medical records for [Mr. Hams’] file and to discuss [his] claim for total disability including [Mr. Hams’] current restrictions and limitations.” Ms. Roberts stated that “without such an authorization, [NEF] would never be able to secure any independent information regarding the insured for claim purposes.” Ms. Roberts also stated “[i]mplieit in [NEF’s] claim processing is [NEF’s] right to investigate. As part of [NEF’s] claim evaluation process, [NEF] need[ed] to obtain information on 1) restrictions and limitations due to [Mr. Hams’] medical condition and 2) description and understanding of the important duties of [Mr. Hams’] occupation.”
 

 Ms. Roberts further stated NEF was “duly compliant with all legislated Federal and State privacy laws including HIPAA [Health Insurance Portability and Accountability Act].” and that only “necessary personnel” would review Mr. Harris’ file for the purpose of claim Revaluation. Ms. Roberts cautioned that “[NEF] may during the life of a claim refer claimants to independent medical evaluators; and [NEF] would release copies of medical records to this entity to assist in the claim evaluation.”
 

 At the conclusion of her correspondence, Ms. Roberts quoted Section 9.4 of the MLIC policy captioned “Written Proof of Loss.” Ms. Roberts claimed Mr. Harris’ continued refusal to execute the Employee Authorization would effectively limit NEF’s right to investigate and fail to comply with Mr. Harris’ obligation to provide NEF -with a “complete proof of loss.”
 

 Mr. Harris allegedly placed a telephone call to MLIC upon receipt of Ms. Robert’s correspondence, and his call was later returned by Diane Freeman, who purportedly advised Mr. Harris that she was an employee of MLIC and authorized to speak to him regarding his claim. Ms. Freeman allegedly advised Mr. Harris that MLIC’s rationale for insisting that he execute the “Employee Authorization” was simply to conform to federal HIPAA standards. Accordingly, Mr. Harris proposed, and Ms. Freeman allegedly accepted, an alternative solution whereby Mr. Harris agreed to prepare or obtain HI-PAA compliant authorizations that would be acceptable to all health care providers and forward the executed originals to Ms. Freeman in order that MLIC might obtain all medical records, medical opinions, and medical reports relating to Mr. Harris’ past and current treatment.
 

 In furtherance thereof, on January 27, 2006, Mr. Harris forwarded to Ms. Freeman via facsimile transmission and regular mail a copy of his eight-page evaluation by the Amen Clinic, and an original “Authorization to Exchange Information” required by the Amen Clinic to release Mr. Harris’ medical files. Also enclosed therewith was a copy of a HIPAA compliant medical authorization addressed to Dr. Dennis Raymond authorizing the release of all medical records requested, including psychotherapy notes if required.
 
 [3]
 
 Mr. Harris concluded this correspondence by stating that it was his belief that he had complied with his obligation under the provisions of the
 
 *270
 
 MLIC policy to provide complete hand satisfactory proof of loss. Mr. Harris wrote to Ms. Freeman again on February 10, 2006, and enclosed additional documentation to update his claim information. Said documentation consisted of a February 8, 2006 order from the Louisiana Supreme Court transferring Mr. Harris to “Disability Inactive Status” effective immediately. Also enclosed was a copy of an IRS Form 1099 reflecting Mr. Harris’ total compensation and net income for 2005, through September 15, 2006[sic].
 

 Ms. Freeman wrote to Mr. Harris on February 8, 2006,
 
 [4]
 
 and acknowledged receipt of “all portions of [Mr. Hams’] disability claim forms, excluding a current HIPAA signed authorization.” Ms. Freeman explained that using September 16, 2005, as the as the start date of Mr. Harris’ disability, Mr. Harris’ “first disability benefit consideration would have occurred on January 15, 2006; however, [NEF] need[ed] additional information before a claim determination can be made.” “To determine if [Mr. Harris met] the policy definition of disability,” Ms. Freeman advised NEF needed to verify (1) any restrictions and limitations Mr. Harris may have; (2) the duties Mr. Harris was performing in the occupation(s) in which he was engaged at the time the disability began; and (3) how said restrictions and limitations affect the performance of said duties.
 

 In determining any restrictions or limitations Mr. Harris may have, Ms. Freeman advised NEF had requested and received Mr. Harris’ records from Dr. Dennis Raymond and the Amen Clinic in Newport Beach, California. To assist NEF in evaluating Mr. Harris’ claim, Ms. Freeman advised NEF needed to know the duties Mr. Harris performed in his regular occupation prior to the onset of his disability and those duties he can no longer perform. Ms. Freeman stated NEF expected to make a decision on Mr. Harris’ claim “within 60 days, provided we have all of the information needed to determine our liability.” In furtherance thereof, Ms. Freeman requested that Mr. Harris provide NEF with: (1) Billings, diaries, court appearances and court records from 2003 to the present; (2) Complete copies of business and personal tax returns with all schedules and 1 ^attachments, years 2003, 2004, and 2005 when available; (3) Claimant’s Supplemental Statement completed in full, by March 10, 2006; and (4) Signed and dated HIPAA authorization, form 1198-02-NEF-AUTH (9/04). Ms. Freeman stated that as soon as the foregoing information was received, Mr. Harris’ claim would receive NEF’s “immediate attention.” Ms. Freeman wrote to Mr. Harris again on March 15, 2006,
 
 [5]
 
 acknowledging NEF’s receipt of the supreme court’s order transferring Mr. Harris to disability inactive status, and stated that NEF was awaiting the documentation Ms. Freeman requested from Mr. Harris in her February 8, 2006 correspondence. Ms. Freeman further stated that based upon NEF’s initial review of the clinical records received from Dr. Dennis Raymond and the Amen Clinic, it was determined an Independent Medical Exam (“IME”) was required to clarify Mr. Harris’ “psychiatric diagnoses and any resulting restrictions or limitations due to [Mr.
 
 *271
 
 Hams’] condition(s).” Ms. Freeman requested that Mr. Harris respond within 14 days and provide NEF with dates when he would not be available for an IME.
 

 Ms. Freeman wrote to Mr. Harris a third time on April 11, 2006,
 
 [6]
 
 seeking a response to NEF’s previous requests for information relevant to Mr. Harris’ claim. Ms. Freeman advised that her attempts on this date to contact Mr. Harris via his residence and business phones proved unsuccessful as both had been 'disconnected. Ms. Freeman sought all previously requested documentation within 15 days.
 

 On May 28, 2006
 
 [7]
 
 , Ms. Freeman wrote to Mr. Harris once again and set forth a chronology regarding the handling of Mr. Harris’ claim to date. Ms. Freeman advised that Mr. Harris’ file was being forwarded to one of NEF’s Field Claim Representatives, who was “an employee of UnumProvident who works within [Mr. Hams’] geographic area to conduct interviews with [NEF’s] clients.” Ms. Freeman also advised that the field representative would “present [Mr. Harris] with a HIPAA authorization for signature, which |7will permit [NEF] to release [Mr. Hams’] medical and other claim file information to the examiner(s) who will perform the [IME].” Ms. Freeman further advised that “[a]s we proceed with the scheduling of the IME and our continued evaluation of your claim, benefits will be issued ... with Reservation of Rights.”
 

 Thereafter, Mr. Harris evidently contacted NEF and advised he had retained an attorney to represent him. Through correspondence directed to said attorney and dated June 8, 2006, Charles L. McGinty, identified himself as a Field Claims Consultant with UnumProvident, Corp., which he claimed was “ [Mr. Hams’] disability insurer.” Mr. McGinty requested a standard interview with Mr. Harris and his attorney “as part of the continuing evaluation process.” Mr. McGinty advised the areas covered in said interview would include, but not be limited to, Mr. Harris’ occupational duties; his medical history, including the names and addresses of Mr. Harris’ medical providers, his symptoms, a list of all medications, his current treatment and restrictions and limitations; Mr. Harris’ financial situation in reference to other disability benefits/policies and salary continuation; Mr. Harris’ current daily activities, future plans and any other concerns or questions of Mr. Harris.
 

 In an effort to verify Mr. Harris’ status as a trial attorney, Mr. McGinty requested the following information: (1) a list of Mr. Harris’ trials going back two years prior to his claimed disability date with case titles, court location, and/or judicial district with docket numbers; (2) current status of who is handling these cases including their name and telephone number; (3) any pending and/or past disciplinary complaints/actions against Mr. Harris regarding his legal practice; and (4) status of Mr. Harris’ lawsuit filed against his partner and the name of the attorney representing Mr. Harris.
 

 Lastly, Mr. Harris requested “a copy of the police report filed or incident/item number regarding an alleged burglary of [Mr. Hams’] law office,” and advised he would also present a HIPAA form for Mr. Harris to sign at the interview.
 

 
 *272
 
 ACTION OF THE TRIAL COURT
 

 Mr. Harris instituted the present litigation through the filing of a petition in proper person on September 27, 2006. Named as defendants in said litigation were MLIC, NEF |8d/b/a New England Life Insurance Company
 
 [8]
 
 (erroneously referred to therein as “New England Life Insurance Company”), Diane Freeman, Katherine Sakaloglou, and Charles L. McGinty (collectively referred to hereafter as “defendants”). Said petition, containing ninety-seven paragraphs, alleged Mr. Harris had qualified for disability benefits pursuant to the policy, and that Mr. Harris had established, through his treating physician, his inability to perform the important duties of his occupation as a trial attorney. Mr. Harris alleged MLIC possessed, by no later than February 10, 2006, irrefutable evidence of his disability status within the terms of the policy. Mr. Harris further alleged that pursuant to the terms of the disability policy issued to him by MLIC, the insurer’s obligation to pay benefits was activated once he established, through the submission of reports from his treating physician, his inability to perform the important duties of his occupation and provided verification of his income up to the time of his disability. In requesting that he execute a HIPAA authorization, Mr. Harris alleged that MLIC was attempting to deceptively alter the substantive terms of the disability policy issued to him by MLIC.
 

 With respect to the non-corporate defendants, namely, Ms. Freeman, Ms. Sakalo-glou, and Mr. McGinty, said individuals were alleged to be agents and employees for and on behalf of NEF. Mr. Harris alleged that said individuals “collectively, and in concert, as joint tortfeasors, violated the [ Met-Life] Code of Conduct” applicable to all officers and employees of Met-Life, its affiliated companies and subsidiaries, including NEF.
 

 Following numerous attempts to draft a HIPAA release with language acceptable to all parties, it was determined further discussions between the parties would prove fruitless. On June 21, 2007, MLIC notified Mr. Harris that due to his refusal to sign an authorization, MLIC could not continue to pay monthly benefits pursuant to a reservation of rights. Unable to continue its evaluation of Mr. Harris’ condition, MLIC closed its claim on June 21, 2007.
 

 |9On June 13, 2008, Mr. Harris filed a First Amended and Supplemental Petition setting forth in greater detail his general and special damages and the grounds therefore. A peremptory exception raising the objection of no cause of action, or in the alternative, a motion for summary judgment together with supporting memorandum was filed on behalf of defendants, Ms. Freeman and Ms. Sagaloglou on June 24, 2008. On that same date, a dilatory exception raising the objection of prematurity or, in the alternative, a peremptory exception raising the objection of no cause of action together with supporting memorandum was filed on behalf of all defendants.
 

 In response, Mr. Harris filed a motion for a partial summary judgment on July 11, 2008, seeking a determination that he is totally disabled within the terms of the MLIC disability policy and entitled to benefits together with double statutory penal
 
 *273
 
 ties (pursuant to La. R.S. 22:213 A(3)
 
 [9]
 
 ). Mr. Harris also moved to strike the exceptions filed by defendants. On August 21, 2008, a hearing was held by the trial court with respect to all exceptions and motions. After reviewing the pleadings and the arguments put forth on behalf of the parties, the trial court, for reasons orally assigned, sustained defendants’ exception objecting to prematurity and dismissed Mr. Harris’ suit without prejudice. As a result of this ruling, all remaining motions and exceptions were rendered moot and removed from the court’s docket.
 

 Following the denial of his motion for a new trial, Mr. Harris filed the instant appeal. In connection with his appeal, Mr. Harris assigned error to the trial court’s grant of defendants’ exception.
 

 ^STANDARD OF REVIEW
 

 The Louisiana Constitution of 1974 provides that the appellate jurisdiction of the courts of appeal extends to both law and facts. La. Const., art. V, § 10(B). It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.”
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent
 
 de novo
 
 review and assessment of the record.
 
 Held v. Aubert,
 
 2002-1486, p. 5 (La.App. 1 Cir. 5/9/03), 845 So.2d 625, 630. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights.
 
 Williams v. City of Baton Rouge,
 
 2002-0682, p. 13 (La.App. 1 Cir. 3/28/03), 844 So.2d 360, 371.
 

 The facts are not in dispute with respect to this appeal. Therefore, the issue is whether the trial court correctly interpreted and applied the law. Appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect.
 
 City of Baker School Board v. East Baton Rouge Parish School Board,
 
 99-2505, pp. 2 (La.App. 1 Cir. 2/18/00), 754 So.2d 291, 292. On legal issues, the appellate court gives no special weight to the findings of the trial court, but exercises its constitutional duty to review questions of law and renders judgment on the record.
 
 Northwest Louisiana Production Credit Association v. State, Department of Revenue and Taxation,
 
 98-1995, p. 3 (La.App. 1 Cir. 11/5/99), 746 So.2d 280, 282.
 

 In the instant case, we must determine whether the trial court erred in its finding that Mr. Harris was obliged, pursuant to
 
 *274
 
 the terms of his policy with MLIC, to execute a fourth medical authorization to determine the extent of his disability prior to initiating litigation in court.
 

 LAW AND ANALYSIS
 

 Louisiana Code of Civil Procedure article 926(A)(1) provides for the dilatory exception raising the objection of prematurity. Such an objection is intended to retard the [^progress of the action rather than defeat it. La.Code Civ. P. arts. 923 and 926. A suit is premature if it is brought before the right to enforce the claim sued on has accrued. La.Code Civ. P. art. 423. Prematurity is determined by the facts existing at the time suit is filed.
 
 Houghton v. Our Lady of the Lake Hosp. Inc.,
 
 03-0135, p. 5 (La.App. 1 Cir. 7/16/03), 859 So.2d 103, 106. Evidence may be introduced to support or controvert the exception, when the grounds do not appear from the petition. La.Code Civ. P. art. 930. The objection of prematurity raises the issue of whether the juridical cause of action has yet come into existence because some prerequisite condition has not been fulfilled.
 
 Bridges v. Smith,
 
 01-2166, p. 4 (La.App. 1 Cir. 9/27/02), 832 So.2d 307, 310,
 
 writ denied,
 
 02-2951 (La.2/14/03), 836 So.2d 121. The objection contemplates that the action was brought prior to some procedure or assigned time, and is usually utilized in cases where the applicable law or contract has provided a procedure for one aggrieved of a decision to seek relief before resorting to judicial action.
 
 Plaisance v. Davis,
 
 03-0767, p. 6 (La.App. 1 Cir. 11/7/03), 868 So.2d 711, 716,
 
 writ denied,
 
 03-3362 (La.2/13/04), 867 So.2d 699.
 

 In the present case, defendants argued before the trial court that Mr. Harris’ suit is premature for the reason that Mr. Harris filed suit for benefits pursuant to his disability policy together with claim for damages without executing a medical authorization. Defendants claimed that due to Mr. Harris’ refusal to execute a medical release, they have been unable to properly evaluate the extent of Mr. Harris’ disability through an IME. Defendants argued that rather than accepting the Louisiana Supreme Court’s finding that Mr. Harris was disabled, they are entitled to an IME detailing the nature and extent of said disability. In his response, Mr. Harris attempted to explain to the court that he had previously executed three medical authorizations directed to his treating physician and health care providers, but objected to the fourth medical authorization, styled an “Income Protection Claim/Employee’s Authorization” as it contained broad language unrelated to a medical authorization.
 

 It appears from the record that Mr. Harris, then a practicing attorney, purchased |, disability income insurance, bearing policy number 191D224555, from MLIC on March 1, 1992. Said disability policy remained in effect through the onset of the disability claimed by Mr. Harris on September 15, 2005.
 

 In
 
 Marcus v. Hanover Insurance Co., Inc.,
 
 98-2040, p. 4 (La.6/4/99), 740 So.2d 603, 606, the supreme court set forth the following legal axioms relating to the interpretation of insurance policies. An insurance policy is a contract and, as with all other contracts, it constitutes the law between the parties. If the policy wording at issue is clear and expresses the intent of the parties, the agreement must be enforced as written. The parties’ intent, as reflected by the words of the policy, determines the extent of coverage.
 
 Ledbetter v. Concord General Corp.,
 
 95-0809, p. 3 (La.1/6/96), 665 So.2d 1166, 1169,
 
 rehearing denied, amended on other grounds,
 
 95-0809 (La.4/18/96), 671 So.2d 915. An insurance policy should not be interpreted in an unreasonable or a
 
 *275
 
 strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd result.
 
 Doiron v. Louisiana Farm Bureau Mutual Insurance Company,
 
 98-2818, p. 7 (La.App. 1 Cir. 2/18/00), 758 So.2d 357, 362. However, if there is any doubt or ambiguity as to the meaning of a provision in an insurance policy, it must be construed in favor of the insured and against the insurer.
 
 See
 
 La. Civ. Code art.2056. When the ambiguity relates to an exclusionary clause, the law requires that the contract be interpreted liberally in favor of coverage.
 
 Gaylord Chemical Corporation v. ProPump, Inc.,
 
 98-2367, p. 4 (La.App. 1 Cir. 2/18/00), 753 So.2d 349, 353. Whether a contract is ambiguous is a question of law.
 
 Id.
 
 With these principles in mind, we now turn to a review of the insurance policy.
 

 Part 1 of the NEF policy defines terms used in the policy and provides in pertinent part:
 

 [[Image here]]
 

 1.2 You” and Your refer to the insured named in the Policy Schedule.
 

 1.3 “We”, “Us” and “Our” refer to New England Mutual Life Insurance Company....
 

 [[Image here]]
 

 1.6 “Sickness” means sickness or disease which first manifests itself after the Date of Issue and while Your Policy is in force....
 

 I is* * * *
 

 1.8 “Physician’s Care” means the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability.
 

 [[Image here]]
 

 1.10 “Total Disability” means that because of Injury or Sickness:
 

 a. You are unable to perform the important duties of Your Occupation; and
 

 b. You are receiving Physician’s Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician’s Care would be of no benefit to You.
 

 Part 9 of the NEF policy is captioned “CLAIMS” and further provides in pertinent part:
 

 * * * *
 

 9.2 WRITTEN NOTICE OF CLAIM
 

 Written notice of claim must be given to Us within 30 days after a covered loss starts. If this cannot be done, then notice must be given as soon as reasonably possible.
 

 The notice will be sufficient if it identifies You and is sent to Our Disability Income Administration Center, 18 Chestnut Street, Worcester, Massachusetts 01608, or is given to Our agent.
 

 9.3 CLAIM FORMS
 

 After We receive the written notice of claim, We will send You Our proof of loss forms within 15 days. If We do not, You will meet the written proof of loss requirements if You send Us, within the time set forth below, a written statement of the nature and extent of Your loss.
 

 9.4 WRITTEN PROOF OF LOSS
 

 Written proof of loss must be sent to Us within 90 days after the end of each period for which you are claiming benefits. If that is not reasonably possible, Your claim will not be affected. But, unless You are legally incapacitated, written proof must be given within one year of the date it was required.
 

 We can also require reasonable proof from You of Your:
 

 a. Prior Earnings; and
 

 
 *276
 
 b. Monthly Earnings for the month for which Disability is claimed.
 

 This may include personal and business tax returns filed with the Internal Revenue Service, financial statements, accountant’s statements or other proof acceptable to Us or which We may require. We can have an audit performed as often as is reasonably required while Your claim is continuing. Such an audit will be at Our expense.
 

 9.5 EXAMINATIONS
 

 At Our expense, We can have a Physician of Our choice examine You as often as reasonably required while Your claim is continuing.
 

 Ji4* * * *
 

 Part 10 of the NEF policy is captioned “THE CONTRACT” and further provides in pertinent part:
 

 10.1 ENTIRE CONTRACT; CHANGES
 

 This Policy (with the application and attached papers) is the entire contract between You and Us....
 

 ⅜ ⅜ ‡ ‡
 

 10.4 LEGAL ACTION
 

 You cannot bring legal action within 60 days from the date written proof of loss is given. You cannot bring it after 3 years from the date written proof is required.
 

 Based upon our review of the MLIC policy issued to Mr. Harris, we note at the outset that Mr. Harris instituted the instant suit on September 27, 2006, a period greater than 60 days from November 21, 2005, the date Mr. Harris filed his initial claim for benefits, and February 8, 2006, the date Ms. Freeman acknowledged receipt of “all portions of [Mr. Hams’] disability claim forms, excluding a current HIPAA signed authorization.” We find no provision within the subject policy restricting the right of an insured to file suit until after an IME has been performed. It is apparent from the record MLIC possessed, no later than February 10, 2006, evidence as to Mr. Harris’ total disability status as defined under the terms of the policy. Mr. Harris established, through the submission of reports from his treating physician, his inability to perform the important duties of his occupation and provided verification of his income up to the time of his disability.
 

 Additionally, although MLIC has the right pursuant to Section 9.5 of the subject policy to require an insured to submit to IMEs “as often as reasonably required while [the insured’s] claim is continuing” submission to an IME is not, pursuant to the terms of the policy, a condition precedent to the institution of litigation.
 

 It appears defendants sought to have an IME of Mr. Harris performed, which they have a right to do “as often as reasonably required” pursuant to Section 9.5 of the subject policy; however, defendants maintained said IME could not be performed unless and until | lsMr. Harris executed the “Income Protection Claim/Employees’ Authorization,” that defendants contend is simply a “HIPAA authorization.” HIPAA was passed long after March 1, 1992, the effective date of the insurance policy at issue in this case.
 

 Contained within the provisions of the Health Insurance Portability and Accountability Act (“HIPAA”) of 1996, are regulations promulgated by the secretary of the United States Department of Health and Human Services (“HHS”) establishing national standards to insure the privacy of “protected health information” or individually identifiable health information. Said regulations are generally referred to as the “Privacy Rule.” 45 C.F.R. § 164(E);
 
 see also Hill v. East Baton Rouge Department of Emergency Medical
 
 Services, 05-1236, p. 6 (La.App. 1 Cir. 12/22/05), 925
 
 *277
 
 So.2d 17, 21,
 
 writ denied,
 
 06-0229 (La.5/5/06), 927 So.2d 311.
 

 Mr. Harris has urged that HI-PAA regulations do not apply to disability insurance policies such as the policy provided by MLIC in the present case. We agree. Pursuant to the definitions set forth in 45 C.F.R. § 160.103, “Health plan means an individual or group plan that provides, or pays the cost of, medical care (as defined in section 2791(a)(2) of the PHS [Public Health Service] Act, 42 U.S.C. 300gg-91(a)(2)).” The statute further provides “Health plan excludes: (i) Any policy, plan, or program to the extent that it provides, or pays the costs of, excepted benefits that are listed in section 2791(c)(1)of the PHS Act, 42 U.S.C. 300gg-91(c)(1).” Additionally, 42 U.S.C. 300gg-91(c) provides:
 

 (c) Excepted benefits
 

 For purposes of this subchapter, the term “excepted benefits” means benefits under one or more (or any combination thereof) of the following:
 

 (1) Benefits not subject to requirements
 

 (A) Coverage only for accident, or disability income insurance, or any combination thereof.
 

 Based upon our reading of the foregoing statute, we conclude that HIPAA regulations are not applicable to an insurance disability policy such as the policy provided by MLIC in the present case.
 

 Additionally, we note that a copy of the “Income Protection Claim/ Employee’s Authorization” form at issue in this case is contained within the record. Although defendants claim said form is simply a “medical authorization” we find that the [ 16information released by the execution of said authorization extends much further and may alter some of the terms of the original policy. The form in question, form 1198-02-NEF-AUTH (9/04), provides, in pertinent part, as follows:
 

 New England Life Insurance Company Metropolitan Life Insurance Company
 

 Members of the MetLife Family of Companies
 

 Claims settlement services with respect to Disability Income claims may be adjudicated on behalf of NEF under policies issued by New England Life Insurance Company (which became Metropolitan Life Insurance Company policies upon merger of these two companies) and are provided and underwritten by the Paul Revere Life Insurance Company, a subsidiary of UnumProvident Corporation, pursuant to a written agreement.
 

 NOTE: This Authorization form was designed to comply with requirements set forth in the Health Insurance Portability and Accountability Act (HIPAA). HI-PAA requires that we obtain this authorization from you. You are not required to sign the authorization, but if you do not, we may not be able to evaluate or administer your claim(s). Please sign and return this authorization to the address noted above.
 

 AUTHORIZATION
 

 For Disability Income Insurance claims settlement purposes
 

 I authorize any health care provider including, but not limited to, any health care professional, any medical facility, hospital, clinic, laboratory, pharmacy or other medically related facility or service; health plan; rehabilitation professional; vocational evaluator; insurance company; reinsurer; insurance service provider; third party administrator; producer; employer; consumer reporting agency; department of motor vehicles; the MIB Group, Inc.; the Association of Life Insurance Companies (which
 
 *278
 
 operates the Health Claims Index and the Disability Income Record System); and government organization that has information about my health; financial or credit history; personal information or data; earnings; employment history; motor vehicle reports, driving record; aviation activities; or other insurance coverage, claims and benefits to disclose any and all of this information, including my entire medical file for up to the last ten (10) years, to the New England Life Insurance Company or Metropolitan Life Insurance Company, or to persons who administer disability income claims for New England Life Insurance Company or Metropolitan Life Insurance Company, including, and/or The Paul Revere Life Insurance Company and their duly authorized representatives (the “Company”). Information provided about my health may relate to any disorder of the immune system including, but not limited to, HIV and AIDS; use of drugs and alcohol (including information related to drug and alcohol abuse protected by Federal Regulations 42 CFR part 2); and mental and physical history, condition, advice or treatment, but does not include psychotherapy notes. I understand that any information the Company obtains pursuant to this authorization will be used for evaluating and administering my claim(s) for benefits, which may include assisting me in returning to work. I further understand that the information is subject to redisclosure (to the extent required or permitted by applicable laws) and may no longer be protected by certain federal regulations governing the privacy of health information.
 

 ⅜ ⅜ ⅜ ⅜
 

 I may revoke this authorization in writing at any time except to the extent that the Company has relied on the authorization prior to notice of revocation or has a legal right to contest a claim under the policy or the policy itself. I understand if I revoke this authorization, the Company may not be able to evaluate or administer my claim(s) and this may be the basis for denying my claim(s). I may revoke this authorization by sending written notice to the address above.
 

 I understand if I do not sign this authorization or if I alter its content in any way, the Company may not be able to evaluate or administer my claim(s) and this may be the basis for denying my claim(s).
 

 Although MLIC, pursuant to the language of the disability policy at issue in this case, is authorized to obtain an IME of its insured “as often as reasonably required,” said IME is
 
 not
 
 a condition precedent, pursuant to the terms of the policy, to the initiation of litigation by an insured. Further, the foregoing “medical authorization” demanded by MLIC is far broader than what is required for an IME. Thus, Mr. Harris’ suit was clearly not premature, and the trial court legally erred in so holding.
 

 CONCLUSION
 

 Based on the foregoing, we reverse the judgment of the trial court in favor of defendants, and remand this matter to the trial court for further proceedings. All costs of this appeal are assessed against defendants.
 

 REVERSED AND REMANDED.
 

 [1]
 

 . Metropolitan Life Insurance Company (“MLIC”) subsumed New England Mutual Life Insurance Company by merger in 1996, and demutualized in 2000, becoming MLIC, a subsidiary of Met-Life, Inc., an insurance holding company. The parties have stipulated MLIC to be Mr. Harris' insurer with respect to the Preferred Professional Disability Policy.
 

 [2]
 

 . Through consultation with Charles L. Platts-mier, director of the Louisiana State Bar Association’s Office of Disciplinary Counsel ("ODC”), Mr. Harris disclosed his medical condition and executed medical authorizations thereby allowing the ODC to obtain medical records and reports from Mr. Harris’ treating physicians. Upon review of Mr. Harris' medical records, the ODC and Mr. Harris filed a joint petition with the Louisiana Supreme Court requesting a determination of Mr. Harris’ medical qualification for Disability Inactive Status pursuant to Louisiana Supreme Court Rule XIX § 22(C).
 

 [3]
 

 . The Employee's Authorization sought by NEF specifically excluded the release of an insured’s psychotherapy notes.
 

 [4]
 

 . Curiously, unlike all prior and subsequent correspondence between the parties, Ms. Freeman directed this letter to Mr. Harris at his home address. Mr. Harris claimed that he vacated said residence in January 2006 following notice of foreclosure, and thus did not receive this correspondence until June 2006.
 

 [5]
 

 . Said correspondence was directed to Mr. Harris at the customary address used by the parties.
 

 [6]
 

 . Said correspondence was directed to Mr. Harris at the customary address used by the parties, and according to NEF was sent by Federal Express with signature required delivery. It is not known whether Mr. Harris received said correspondence.
 

 [7]
 

 . Said correspondence was directed to Mr. Harris at the customary address used by the parties.
 

 [8]
 

 . Although defendants claim in Footnote 1 of their appellate brief that Mr. Harris "erroneously named New England Life Ins. Co.” as a defendant in this matter, said entity is identified in this manner on the "Employee’s Authorization” or "HIPAA authorization” demanded by defendants.
 

 [9]
 

 . Prior to the redesignation and renumbering of Title 22 of the Louisiana Revised Statutes of 1950, the Louisiana Insurance Code, by Acts 2008, No. 415, § 1, which became effective on January 1, 2009, R.S. 22:213 A(3) (now redesignated R.S. 22:975 A(3)) read as follows:
 

 (3) Notice of claim: Written notice of claim for injury or for sickness must be given to the insurer within twenty days after the date of the accident causing such injury or the commencement of the disability from such sickness,.... Such notice given by or on behalf of the insured or the beneficiary to the insurer at (insert the location of such office as the insurer may designate for that purpose), or to any authorized agent of the insurer, with information sufficient to identify the insured, shall be deemed notice to the insurer. Failure to give such notice within such time shall not invalidate nor reduce any claim if it was not reasonably possible to give such notice within the time required, provided written notice of claim is given as soon as reasonably possible.